Dennis CHAMPION, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2015-SC-000570-DG

Supreme Court of Kentucky.

FEBRUARY 16, 2017

CORRECTED: JUNE 23, 2017

COUNSEL FOR APPELLANT: Linda Roberts Horsman, Department of Public Advocacy, Frankfort.

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Raymond M. Larson, Commonwealth Attorney, John Jason Rothrock, Lexington.

COUNSEL FOR AMICUS CURIAE: THE AMERICAN CIVIL LIBERTIES UNION (ACLU): William Ellis Sharp, ACLU of Kentucky, Tad Thomas, Lindsy Lopez, Thomas Law Offices, Louisville.

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

The Lexington-Fayette Urban County Government adopted Ordinance 14-5 prohibiting all begging and soliciting from public streets or intersections within the urban-county area.[1] Dennis Champion was arrested and charged with violating this ordinance. He appeals the judgment of conviction and sentence that followed his conditional guilty plea to that charge in district court. We granted Champion's motion for discretionary review of the circuit-court judgment affirming the judgment of conviction and sentence on appeal. We now reverse the circuit-court's decision and remand the case to district court for dismissal of the charge against Champion because we hold that Ordinance 14-5 is a content-based regulation of expression that unconstitutionally abridges freedom of speech under the First Amendment.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

In 2007, the Lexington-Fayette Urban County Government enacted Ordinance 14-5, a blanket prohibition against all "begging and solicitation of alms." Precisely, the ordinance criminalizes the following behavior:

(1) No person shall beg or solicit upon the public streets or at the intersection of said public streets within the urban county area.

(2) Any person who violates any provision of this section shall be fined not less than one hundred dollars ($100.00) or be imprisoned not less than ten (10) days nor more than thirty (30) days or both for each offense.

According to the text of the ordinance, any person in the city streets or at city intersections seeking any form of financial contribution may suffer criminal liability despite the ordinance's title suggesting this prohibition is limited only to solicitation of "alms."

Dennis Champion was standing with a handmade sign at a prominent Lexington intersection begging for financial assistance when he was spotted by law enforcement. The officer apprehended him and cited him for violation of Ordinance 14-5. Champion failed to appear at his designated court date in district court, and a bench warrant was issued for his arrest. He was later arrested and arraigned, at which time he was offered a three-day jail sentence with credit for jail-time served in exchange for a guilty plea. Champion entered a conditional guilty plea, and the district court entered judgment accordingly. Champion appealed the judgment to circuit court.

On appeal, Champion challenged the constitutionality of Lexington's ordinance, raising two primary arguments. First, he questioned the legitimacy of Ordinance 14-5 as a valid exercise of local governmental power to criminalize particular behavior.[2] And second, he challenged the ordinance as an unconstitutional abridgement of his freedom of speech under the First Amendment to the United States Constitution. The circuit court rejected Champion's arguments and affirmed the district court

---

1. *See* LFUCG Ordinance 14-5.

2. Because we hold that the ordinance is unconstitutional under the First Amendment, it does not matter whether the city had the power to enact it or not. So we will not address that issue in today's opinion.

conviction. Champion then sought discretionary review in the Kentucky Court of Appeals, but the appellate court declined to take his case.

## II. ANALYSIS.

### A. First Amendment Standards of Review.

 The First Amendment to the United States Constitution boldly declares that "Congress shall make no Law ... abridging the freedom of speech."[3] This reflects, congruently with other First Amendment freedoms, the fundamental American principle that "each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."[4] Indeed, "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because it finds the idea itself offensive or disagreeable."[5] Under the Free Speech Clause, a government is powerless to restrict an expression because of its "message, its ideas, its subject matter, or its content."[6] This maxim applies equally to federal, state, and municipal governments through the Due Process Clause of the Fourteenth Amendment.[7]

Panhandling itself can simplistically be defined as "any in-person solicitation for immediate charitable giving of either cash or goods for the purpose of benefiting the person doing the solicitation."[8] But despite the societal stigma associated with panhandling, this form of expression is widely considered to be constitutionally protected speech. In *Schaumburg v. Citizens for a Better Environment*, the Supreme Court reviewed a statute requiring that any charity engaging in door-to-door solicitation must dedicate at least seventy-five percent of its proceeds to charitable purposes.[9] But the Court ruled that solicitation intrinsically contained both political and economic expression, and held that it would not engage in the process of determining which aspects of a particular charitable solicitation were constitutionally protected speech and which were not.[10] So *Schaumburg* appears to stand for the proposition that solicitation on behalf of charitable organizations is constitutionally protected speech under the First Amendment.

 The Supreme Court has yet to extend fully this protection to individuals soliciting for their own well-being. But the Second Circuit Court of Appeals did embrace this rule in *Loper v. New York City*

---

3. U.S. Const. amend. I.

4. *Agency for Intern. Development v. Alliance for Open Society, Intern., Inc.,* —— U.S. ——, 133 S.Ct. 2321, 2327, 186 L.Ed.2d 398 (2013) (quoting *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

5. *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

6. *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

7. *See, e.g., Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925). Notably, the Kentucky Constitution also protects both

"the right of freely communicating their thoughts and opinions" and "the right of acquiring and protecting property." Ky. Const. § 1. Because Champion only argues against Ordinance 14-5 under the federal Constitution, we need not determine today whether Section 1's free-speech provision affords a greater protection independent of the First Amendment.

8. Anthony D. Lauriello, *Panhandling Regulation After Reed v. Town of Gilbert,* 116 Colum. L. Rev. 1105, 1107 (2016).

9. 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).

10. *Id.* at 632, 100 S.Ct. 826.

*Police Dept.*[11] The reviewing court labeled panhandling "communicative activity," and, in light of *Schaumburg,* held there is "little difference between those who solicit for organized charities and those who solicit for themselves."[12] This position has been adopted by a host of other circuits, including our own Sixth Circuit Court of Appeals.[13] So we are confident that case law and normative considerations[14] support the ultimate conclusion that panhandling is constitutionally protected speech. Accordingly, because this form of expression is not, in and of itself, treated differently under the First Amendment, we must review panhandling regulations under the same standard we would review any other regulation of protected speech.

■■■ Critical to any First Amendment analysis is, as a threshold matter, the type of forum implicated in any governmental speech regulation. Public streets and intersections are paradigmatic examples of traditional public forums—areas that serve an important function for "purposes of assembly, communicating thoughts between citizens, and discussing public questions."[15] Public forums enjoy a "special position in terms of First Amendment protection" because of the critical role they play in fostering public debate, expression, and assembly.[16] And as such, any content-based laws—those that target particular speech based on its communicative content—are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[17]

■■ In *Reed v. Town of Gilbert,* the United States Supreme Court invalidated an Arizona sign code as an unconstitutional content-based regulation of free speech.

---

**11.** 999 F.2d 699 (2nd Cir. 1993).

**12.** *Id.* at 704.

**13.** *See Speet v. Schuette,* 726 F.3d 867 (6th Cir. 2013) (invalidating Michigan statute against begging because "begging is a form of solicitation that the First Amendment protects.") *Id.* at 875. For a survey of other circuit courts of appeal, *see Reynolds v. Middleton,* 779 F.3d 222, 225 (4th Cir. 2015); *Gresham v. Peterson,* 225 F.3d 899, 904 (7th Cir. 2000); *ACLU v. City of Las Vegas,* 466 F.3d 784, 792 (9th Cir. 2006); and *Smith v. City of Fort Lauderdale,* 177 F.3d 954, 955-56 (11th Cir. 1999).

It should also be noted that each of these decisions predates the Supreme Court's ruling in *Reed v. Town of Gilbert,* — U.S. —, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). The *Reed* decision may have further insulated this position within the lower federal courts because of its impact on a reviewing court's determination of whether a regulation of speech is content-based. *See infra.* This has already set off a chain reaction of lower federal courts invalidating state or local panhandling laws. *See Norton v. City of Springfield,* 806 F.3d 411 (7th Cir. 2015) (Easterbrook, J.) (reversing earlier decision relating to panhandling regulation following *Reed*) and *Thayer v. City of Worcester,* — U.S. —, 135 S.Ct. 2887, 192 L.Ed.2d 918 (2015) (remanding for consideration in light of *Reed*).

**14.** *See* Lauriello, *supra* note 8 at 1121 (academia has suggested panhandling has First Amendment value for raising awareness to societal ills such as homelessness and poverty, it may inform voter choices in the ballot box, it forces passersby to evaluate their own thoughts on giving alms to the needy, and it allows beggars the self-realization to express their values and share their plight with society in general.) *See also* Helen Hershkoff & Adam S. Cohen, *Commentary, Begging to Differ: The First Amendment and the Right to Beg,* 104 Harv. L. Rev. 896, 898 (1991).

**15.** *Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

**16.** *See Snyder v. Phelps,* 562 U.S. 443, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (quoting *United States v. Grace,* 461 U.S. 171, 180, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)).

**17.** *Reed v. Town of Gilbert,* — U.S. —, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236 (2015).

Justice Thomas, writing for the Court, wrote that "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea the message expressed."[18] As matter of common sense, this requires a reviewing court to "consider whether a regulation of speech 'on its face' draws distinctions based on the message it conveys."[19] This analysis is independent of whether the government intends to favor or disfavor the type of speech in an underlying regulation[20]; such laws must still survive strict scrutiny.

The circuit court affirmed Champion's conviction because it determined Lexington's Ordinance 14-5 is a content-neutral regulation of speech, thereby requiring a less-exacting standard of scrutiny to remain constitutionally viable. But this opinion was issued before the Supreme Court's decision in *Reed.* So we must now review Ordinance 14-5's constitutionality in light of this most recent addition to First Amendment jurisprudence.

### B. Ordinance 14-5 is a Content-Based Regulation of Speech.

As the initial prong in his constitutional challenge, Champion argues that Ordinance 14-5 is a content-based regulation of speech, which would accordingly trigger strict-scrutiny review. The circuit court disagreed and declared the ordinance content-neutral. But Lexington now concedes, in light of *Reed,* that its ordinance distinguishes speech based on the underlying message. Because of evolving Supreme Court precedent, we agree that Ordinance 14-5 is content-based.

The Supreme Court's ruling in *Reed* can be seen as a paradigm shift in the interpretation of public-speech legislation. To be sure, long before *Reed,* the Court took strong positions in determining whether a statute engaged in content-based regulation. In *Police Department of Chicago v. Mosley,* the Court reviewed a picketing statute that barred picketing within 150 feet of schools during the school day, notably excluding labor disputes from its strictures.[21] The ordinance was found unconstitutional as an unacceptable content-based regulation of speech. To engage in such discrimination, the Court held, "completely undercut[s] the 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open.' "[22]

But over time, court precedent chiseled away at this bright-line understanding of regulation on the basis of content—particularly in cases involving sexually explicit entertainment. The Supreme Court upheld regulations specific to adult theaters by determining that such laws may be "justified without reference to the content of the regulated speech," because of the "secondary effects" of conduct surrounding those enterprises.[23] And later, in *Ward v. Rock Against Racism,* the Court adopted a new standard for content neutrality, stating

---

18. *Id.* at 2227.

19. *Id.*

20. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

21. 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

22. *Id.* at 96, 92 S.Ct. 2286. *See also Erznoznik v. Jacksonville,* 422 U.S. 205, 209, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (the government has no power to "selectively ... shield the public from some kinds of speech on the ground that they are more offensive than others.").

23. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

that the "principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." [24] So following *Ward*, an otherwise content-based regulation of speech may be content-neutral (and subject to less-exacting scrutiny) simply if the purpose and justification for the law are neutral.

The *Reed* Court rejected this approach. The government's purpose is only relevant to this analysis after concluding that the regulation is facially content-neutral. [25] "Strict scrutiny applies *either* when a law is content based on its face or when the purpose and justification for the law are content based." [26] And accordingly, "a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of review." [27] *Ward*'s framework, and in turn, the government's intent, only matter if the statute is *facially* neutral; it offers no relief to government censorship when it blatantly distinguishes different forms of constitutionally protected speech, offering a different set of rules for each. [28] In essence, content neutrality is determined by two separate and unique questions. So if we conclude Lexington's Ordinance 14-5 discriminates against the content of speech on its face, it matters not whether Lexington imposed this regulation to target certain views or because it disfavored those engaged in begging.

As noted earlier, panhandling typically refers to immediate in-person charitable giving. [29] This is actually more limited than Ordinance 14-5's prohibition of all begging or soliciting in public streets. The Lexington ordinance contemplates far more activity than individual immediate solicitations, and these expressions in particular have traditionally employed constitutional protection in courts of law. But make no mistake, the ordinance, on its face, prohibits a specific type of message from display in public streets where all other forms of speech remain legal.

On its face, Ordinance 14-5 singles out speech for criminal liability based solely on its particularized message. Only citizens seeking financial assistance on public streets and intersections face prosecution. For example, someone standing at a prominent Lexington intersection displaying a sign that reads "Jesus loves you," or one that says "Not my President" has no fear of criminal liability under the ordinance. But another person displaying a sign on public streets reading "Homeless please help" may be convicted of a misdemeanor. The only thing distinguishing these two people is the content of their messages. Thus, to enforce Ordinance 14-5, law en-

---

**24.** 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) The Court elaborated, saying "The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of the expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.*

**25.** *Reed*, 135 S.Ct. at 2228.

**26.** *Id.* (emphasis added).

**27.** *Id.*

**28.** Indeed, "Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech." *Id.* at 2229. *See also Hill v. Colorado*, 530 U.S. 703, 743, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (Scalia, J., dissenting) ("The vice of content-based legislation ... is not that it is always used for invidious, thought-control purposes, but that it lends itself to use for those purposes.").

**29.** *See* Lauriello, *supra* note 8.

forcement would have to examine the content of the message conveyed to determine whether a violation has occurred. This then, in effect, prohibits public discussion in a traditional public forum of an entire topic. And as a result, this ordinance is unambiguously content-based and is presumptively unconstitutional.

The true beauty of the First Amendment is that it treats both Cicero and the vagabond as equals without prejudice to their message. Freedom of speech does not exist for us to talk about the weather; to accept this liberty is to welcome controversy and to embrace discomfort. Just as the government may not ban Lolita because it is Lolita, it likewise may not criminalize the beggar for begging—no matter how noble or altruistic its intentions may be.

There is rarely a constitutionally valid reason for the government to filter the topics for public discourse. We cannot accept different rules and different procedures for different forms of protected speech without at least subconsciously injecting our own subjective values and without implicitly engaging in censorship. So it follows that any law regulating speech by its content—as we have just declared Ordinance 14-5 does—is only law if it satisfies our most engaging form of scrutiny. And we now turn our attention to address that question.

## C. Application of Strict Scrutiny.

■ Now that we have conclusively determined that Ordinance 14-5 regulates particular speech on the basis of its content, Lexington bears the burden of estab-

lishing that this limitation survives strict scrutiny.[30] For the ordinance to remain in effect, the government must satisfactorily prove to us that criminalizing begging and solicitation alone on public streets and intersections furthers a compelling interest and is narrowly tailored to that end.[31] It is clear to us that Lexington cannot offer evidence of a compelling interest, and it most certainly cannot say this law is adequately structured to satisfy the interest it asserts in its defense.

As a presumptively invalid statute, Lexington now bears the burden of showing that its content-based regulation of speech exists to safeguard individual rights rather than to inhibit them. And this is an admittedly challenging burden to meet. But when a lawmaking body threatens an individual's rudimentary fundamental right, it should do so only out of absolute necessity and by the least-restrictive means possible. If government wishes to restrain an individual right in effort to remedy a societal problem, we do not presume the problem exists; the governing body must prove and justify that the behavior in question actually harms society.

■ Lexington's primary justification for Ordinance 14-5—a reason it declares satisfies even strict scrutiny—is the city's desire to ensure public safety and to ensure the free flow of traffic. And no doubt, this is something the Supreme Court has recognized as a legitimate governmental goal in regulating activities in its streets and sidewalks.[32] More particularly, Lexington claims the city has a compelling interest in regulating interactions between pedestrians and people driving vehicles.

30. See Reed, 135 S.Ct. at 2231.

31. See id.

32. See McCullen v. Coakley, —— U.S. ——, 134 S.Ct. 2518, 2535, 189 L.Ed.2d 502 (2014) (recognizing "the legitimacy of the government's interests in ensuring public safety and order promoting the free flow of traffic on streets and sidewalks …").

According to the city, the act of stepping into the streets to get money from the motorist and then proceeding to the next vehicle in line impedes traffic and risks the pedestrian's safety.

But the problem with Lexington's rationale is the total lack of evidence that prohibiting panhandling furthers this governmental interest. We have been offered no evidence of traffic delays or auto accidents resulting from pedestrians—panhandlers in particular—approaching stopped motorists. Just because public safety is recognized as a compelling government interest does not empower the government to enact any measure or target particularized behavior in its name without justification. And invocation of that interest in this instance is disingenuous at best. Adding insult to injury, this was not the particular behavior for which Champion was cited; law enforcement cited Champion for holding a sign at an intersection, not approaching stopped vehicles. Without additional information, we have no proof he even targeted stopped motorists with this speech.

Even if we accept Lexington's assertion that Ordinance 14-5 furthers its compelling interest to promote public safety and free traffic flow, this law is hopelessly under and overinclusive. The ordinance is underinclusive because Lexington has not bothered to explain why panhandling poses a greater risk to public safety than other forms of speech. We have been given no reason to believe that begging presents substantially greater risks than similar conduct, such as street performances or simply asking for directions. And the ordinance is overinclusive because it chills speech otherwise unrelated to interfering with traffic. A person targeting only pedestrians for in-person donations is equally culpable under this ordinance that is allegedly designed for traffic safety. The law does not justify why signage seeking help is inherently more dangerous that one directing motorists to a nearby car-wash fundraiser.

This is not to say we categorically reject the city's interest in ensuring safe and efficient roadways; there is just simply no indication only one form of expression has actually served to make city streets less safe. And there remain a number of content-neutral ways the city could achieve the same goals without unjustifiably abridging individual rights to free speech. For instance, Lexington could prohibit all individuals from approaching stopped motorists—this more directly targets the behavior the city seeks to alleviate and does so without regard to *why* an individual steps into traffic. Laws that promote public safety reflect a fundamental government purpose when precisely enacted and not invoked as pretext to achieve other social interests.

So under a close and careful review of First Amendment precedent and principles, we must unavoidably hold that Lexington Ordinance 14-5 is an unconstitutional regulation of speech.

## III. CONCLUSION.

For the foregoing reasons, we reverse the circuit court's judgment and hold that Lexington's Ordinance 14-5 is unconstitutional. Accordingly, the case is remanded to the Fayette District Court with direction that the charge against Champion be dismissed.

All sitting. Minton, C.J.; Hughes, Keller, Venters, and Wright, JJ., concur. Cunningham and VanMeter, JJ., concur in result only.