RENDERED: OCTOBER 31, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky



2017-SC-000278-DG

LEXINGTON-FAYETTE URBAN COUNTY                         APPELLANT
HUMAN RIGHTS COMMISSION

ON REVIEW FROM COURT OF APPEALS
V.                    CASE NO. 2015-CA-000745-MR
FAYETTE CIRCUIT COURT NO. 14-CI-04474

HANDS ON ORIGINALS                                      APPELLEE

**OPINION OF THE COURT BY JUSTICE VANMETER**

**<u>AFFIRMING</u>**

The ability of federal, state and local governments to protect individuals

from discrimination by places of public accommodation is beyond question.

While very important issues have been presented to the Court in this case, this

matter must be dismissed because the Gay and Lesbian Services Organization

("GLSO"), the original party to bring this action before the Lexington Fayette

Urban County Human Rights Commission ("Commission"), lacked statutory

standing to assert a claim against Hands On Originals ("Hands On") under the

Lexington Fayette Urban County Government ("LFUCG") ordinance, Section 2-33, and KRS[1] 344.120.

## I.    Factual and Procedural Background.

Hands On, a closely-held corporation with three owners, is a small business located in Lexington which prints promotional materials such as shirts, hats, bags, blankets, cups, bottles and mugs for its customers. Hands On employs graphic design artists to implement its customers' expressive purposes. Blaine Adamson, one of Hands On's three shareholders, is its managing owner. He, along with the other two Hands On shareholders/owners, are Christians who operate Hands On consistently with their understanding of the Bible's teachings. The Commission found that Hands On's religious beliefs are sincerely held. Hands On's stated policy on its website provides:

> Right of Refusal: Hands On Originals both employs and conducts business with people of all genders, races, religions, sexual orientations, and national origins. However, due to the promotional nature of our products, it is the prerogative of Hands On Originals to refuse any order that would endorse positions that conflict with the convictions of the ownership.

Hands On owners believe that sexual relations should occur only within a marriage between a man and a woman. To be clear, while they disapprove of relations between members of the same sex, they also disapprove of nonmarital sexual relations between a man and a woman.

---

[1] Kentucky Revised Statutes.

GLSO is a Kentucky not-for-profit corporation,[2] based in Lexington, which represents and advocates for the lesbian, gay, bisexual, transgender, queer, questioning, intersex and allied community ("LGBTQ+"). GLSO holds an annual event called the "Lexington Pride Festival" that supports this community and its message. As noted by the circuit court, "[t]hrough its various programs, publications and other media, GLSO speaks in favor of sexual relationships and sexual activities outside of a marriage between a man and a woman. GLSO seeks to change attitudes concerning this issue and similar issues through its programs and publications." GLSO members and supporters come from all walks of life and all sexual orientations.

In February 2012, a GLSO representative contacted Hands On about printing t-shirts for the upcoming Pride Festival[3] and submitted a t-shirt design. A Hands On employee reviewed it and quoted GLSO a price, without presenting the design to Adamson. The proposed t-shirt design bore the name "Lexington Pride Festival" with rainbow-colored circles around an enlarged number "5" in recognition of the fifth year of the festival.

The following month, a different GLSO representative contacted Hands On about the price quote and spoke with Adamson, who had not yet viewed the t-shirt design. Adamson inquired into what the Pride Festival was and learned that the t-shirts would be in support of the LGBTQ+ community. Adamson

---

[2] The Kentucky Secretary of State's website discloses that "Gay and Lesbian Services Organization" is an assumed name for Lexington Gay Services Organization, Inc. (www.sos.ky.gov) (accessed 4 Sept. 2019).

[3] The 2012 Pride Festival was scheduled for June 30, 2012.

advised the GLSO representative that because of his personal religious beliefs, Hands On could not print a t-shirt promoting the Pride Festival and its message advocating pride in being LGBTQ+. Adamson offered to refer GLSO to another printing shop. At no point did any Hands On representative inquire into the GLSO representatives' sexual orientation, and the GLSO representatives did not disclose such information. Ultimately, GLSO procured the t-shirts from a Cincinnati business free of charge.

Thereafter, Aaron Baker, GLSO's President, filed a Complaint on GLSO's behalf with the Commission alleging that Hands On denied GLSO the full and equal enjoyment of a service when Hands On refused to print the official t-shirts for the organization's Pride Festival. Importantly, the record is clear that no individual claimed Hands On had discriminated. Following an investigation by the Commission, a determination of Probable Cause and Charge of Discrimination was filed declaring that Hands On had violated LFUCG's public accommodation ordinance, Local Ordinance 201-99, Section 2-33, which prohibits a public accommodation from discriminating against individuals based on their sexual orientation or gender identity.

The parties filed cross-motions for summary judgment. Upon finding a violation of Section 2-33, the Hearing Commissioner granted summary judgment in favor of GLSO and the Commission, permanently enjoined Hands On from discriminating against individuals because of their actual or imputed sexual orientation or gender identity, and ordered Hands On to participate in mandatory diversity training to be conducted by the Commission within the

4

following year. The Hearing Officer's Order was subsequently adopted by the Commission.

Hands On appealed the Commission's decision to the Fayette Circuit Court. The circuit court reversed the Commission's opinion and order and remanded the matter with instruction to dismiss the charges against Hands On. On further appeal by the Commission and GLSO, the Court of Appeals affirmed the circuit court in a split 1-1-1 decision.[4] The lead opinion perceived no violation of Section 2-33 by Hands On's engaging in viewpoint or message censorship as a private business. The Commission then petitioned this Court for discretionary review, which was granted.

## II. Standard of Review.

This Court shall affirm the Court of Appeals if the Commission's Order is "[i]n violation of constitutional or statutory provisions;" "[w]ithout support of substantial evidence on the whole record;" "[a]rbitrary, capricious, or characterized by abuse of discretion;" or "[d]eficient as otherwise provided by law." KRS 13B.150(2). The proper interpretation of a statute or ordinance including "the application of [agency-determined] facts to the legal standard" is a question of law and is reviewed de novo. *Bd. of Educ. v. Hurley-Richards*, 396 S.W.3d 879, 885 (Ky. 2013). Likewise, we review de novo the Commission's

---

[4] Then Chief Judge Kramer wrote the majority opinion, as to which Judge Debra Lambert wrote an opinion concurring in result only. Judge Taylor wrote a dissenting opinion.

5

disposition of this matter on summary judgment grounds. *Caniff v. CSX Transp., Inc.*, 438 S.W.3d 368, 372 (Ky. 2014).

### III.  Analysis.

"Statutory standing" refers to "whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right of action." *Lawson v. Office of Atty. Gen.*, 415 S.W.3d 59, 67 (Ky. 2013) (quoting *Small v. Fed. Nat'l Mortgage Ass'n*, 747 S.E.2d 817 (2013)) (quotation marks omitted). "Statutory standing is simply statutory interpretation: the question it asks is whether [the legislature] has accorded *this* injured plaintiff the right to sue the defendant to redress his injury." *Commonwealth Cabinet for Health & Fam. Servs., Dep't of Medicaid Servs. v. Sexton*, 566 S.W.3d 185 (Ky. 2018) (quoting *Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 295 (3d Cir. 2007)) (quotation marks omitted).  Stated differently, "The question whether a plaintiff can sue for violations of [a statute] is a matter of statutory standing, 'which is perhaps best understood as not even standing at all.' . . . Dismissal for lack of statutory standing is properly viewed as dismissal . . . for failure to state a claim [upon which relief may be granted]." *Sexton*, 566 S.W.3d at 191 (quoting 13A Fed. Prac. & Proc. Juris. § 353 (3d ed.)) (quotation marks omitted).

Section 2-32(2)(a), which sets forth the procedural requirements for bringing a claim to the Commission under Section 2-33 *et seq.*,[5] states the following:

---

[5] In addition to the text of Section 2-32, Section 2-33(3) also makes clear that the procedures in Section 2-32 apply in the enforcement of claims under 2-33: "The

> An ***individual*** claiming to be aggrieved by an unlawful practice, or a member of the commission, may file with the commission a verified complaint stating that an unlawful practice has been committed, setting forth the facts upon which the complaint is based, and setting forth facts sufficient to enable the commission to identify the persons charged . . . .

(emphasis added).

Neither the ordinance nor KRS 344.120, the statute incorporated into the ordinance, defines the word *individual.* But Section 2-33(2), the section of the ordinance making it unlawful practice to discriminate based on sexual orientation, expressly incorporates KRS 344.010(1). Specifically, Section 2-33(2) states: "For purposes of this section, the provisions of KRS 344.010(1), . . . as they existed on July 15, 1998, are adopted and shall apply to prohibit discrimination on the basis of sexual orientation or gender identity within Fayette County."

> KRS 344.010(1), in turn, defines the word *person* as
>
> one (1) or more **individuals**, labor organizations, joint apprenticeship committees, partnerships, associations, corporations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in bankruptcy, fiduciaries, receivers, or other legal or commercial entity; the state, any of its political or civil subdivisions or agencies.[6]

(emphasis added).

---

commission is authorized to use the powers and procedures listed in sections 2-31 and 2-32 to carry out the purposes of this section, . . . ." LFUCG Ordinance 2-33(3).

[6] KRS 344.010(1) (emphasis added). The definition of *person* is relevant to Section 2-33 because KRS 344.010 makes it "an unlawful practice for a ***person*** to deny an ***individual*** the full and equal enjoyment of the goods, services, . . . and accommodations of a place of accommodation." (emphasis added).

7

The inclusion of the phrase "one or more individuals" suggests that an individual is one single human. Further, that the definition of a person encompasses both a group of individuals *and* associations, corporations, and unincorporated organizations suggests that those things are not the same (i.e., an *individual* cannot also be an association, corporation, etc.). As such, by the plain text of Section 2-32, only an individual—being a single human—can bring a discrimination claim under Section 2-33.

Adam Baker, a representative of GLSO, filed the original complaint with the Commission on behalf of GLSO alleging Hands On had discriminated on the basis of sexual orientation in violation of Section 2-33. Baker admitted the he did not file the complaint in his individual capacity or on his individual behalf. Because GLSO itself was the only plaintiff to file a claim under Section 2-33 with the Commission and it did not purport to name any individual on whose behalf it was bringing the claim, GLSO lacked the requisite statutory standing.

Statutory standing, unlike constitutional standing, may be waived if not timely pleaded. *Harrison v. Leach*, 323 S.W.3d 702, 708 (Ky. 2010) (explaining that "an appellate court may not, on its own motion, raise the issue of standing of one of the parties to the appeal and then proceed to adjudicate the appeal on grounds of standing when no party has in any manner questioned another party's standing"); *see also Sexton*, 566 S.W.3d at 191) (explaining that *Harrison* was referring to statutory

8

standing and not constitutional standing). Statutory standing, however, was not waived here. Hands On argued first to the Hearing Commissioner that GLSO, as an organization, did not have standing under the ordinance to bring a claim. The Hearing Commissioner held that GLSO did not lack standing under Section 2-33 but employed a statutory analysis that we now reject.[7] Hands On presented this argument at all levels of review, including to this Court.[8] Thus, the issue of whether GLSO had statutory standing to bring the claim is properly before this Court.

While this result is no doubt disappointing to many interested in this case and its potential outcome, the fact that the wrong party filed the complaint makes the discrimination analysis almost impossible to conduct, including issues related to freedom of expression and religion.

---

[7] The Hearing Commissioner looked at the same ordinance provisions and statutes as we do now but reached the opposite conclusion. In his view, the definition of *person* contained in KRS 344.010(1) proved that an *individual* could also be an organization. We disagree with the Hearing Commissioner's interpretation.

[8] Hands On argued the following on page 19, footnote 67 of its brief:

> The Commission argues at length about constitutional principles of associational standing. Comm'n Br. 8-10. But when a party relies on a "specific statute authorizing invocation of the judicial process," "the inquiry as to standing must begin" not with the constitutional principles but by deciding "whether the statute in question authorizes review at the behest of the plaintiff." *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972). Here, the Commission cannot get beyond the statutory standing question because the ordinance permits claims only by "an individual"—not an association. KRS 344.120; LFUCG Ordinance § 2-33(2) (incorporating KRS 344.120). Hence, the Commission's arguments about constitutional standing principles are irrelevant.

Brief for Appellee at 19, n. 67.

9

Normally in these cases, courts look to whether the requesting customer, or some end user that will actually use the product, is a member of the protected class. And even when the reason for the denial is something other than status (conduct, for example), ways exist to determine whether the individual(s) (the requesting customer(s) or end user(s)) was actually discriminated against because the conduct cited is so closely related to that individual's status. But in either scenario (whether the person allegedly discriminated against is the requesting customer or some end user) the individual is the one who has filed the lawsuit, so the court can properly determine whether that person has been discriminated against.

But in this case, because an "individual" did not file the claim, but rather an organization did, we would have to determine whether the organization is a member of the protected class, which we find impossible to ascertain. No end user may have been denied the service who is a member of the protected class, or perhaps one was. If so, then the determination would have to follow whether the reason for denial of service constitutes discrimination under the ordinance, and then whether the local government was attempting to compel expression, had infringed on religious liberty, or had failed to carry its burden under KRS 446.350. But without an individual, as required by Section 2-32(2)(a), this analysis cannot be conducted. Our decision, based on lack of

standing, is necessary because without a proper complainant, no determination can be made as to whether the ordinance was violated.

As such, under Section 2-32(2)(a), an organization—here, GLSO—cannot bring a claim under Section 2-33. Accordingly, GLSO lacked statutory standing, and the Commission erred in not dismissing the case.

## IV. Conclusion.

For the foregoing reasons, the Fayette Circuit Court's Opinion and Order is affirmed.

Minton, C.J.; Buckingham, Hughes, Keller, VanMeter and Wright, JJ., sitting. Minton, C.J.; Hughes, Keller, VanMeter and Wright, JJ., concur. Buckingham, J., concurs by a separate opinion. Lambert, J., not sitting.

BUCKINGHAM, J. CONCURRING: I concur in the well-written majority opinion, but I write separately to express my view that the facts of this case disclose that the Lexington Fayette Urban County Human Rights Commission ("Commission") went beyond its charge of preventing discrimination in public accommodation and instead attempted to compel Hands On to engage in expression with which it disagreed.[9]

---

[9] I acknowledge the fundamental principle that this Court will not issue an advisory opinion when "a judgment when rendered, for any reason, cannot have any practical legal effect upon a then existing controversy." *Newkirk v. Commonwealth*, 505 S.W.3d 770, 774 (Ky. 2016). And, I agree with the Court's adherence to that principle today. Because the complainant in this case lacked standing, any decision issued in this case can have no practical legal effect upon an existing controversy because the complaint was void from the outset.

Nevertheless, in light of the overarching importance of the issues raised in this proceeding, I write separately to express my views on the principal issues raised in

11

Review of a First Amendment compelled-speech claim, as asserted by Hands On, raises "a rule of federal constitutional law" requiring an appellate court to "conduct an independent examination of the record as a whole, without deference" to lower tribunals. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 567 (1995). Further, "[l]aws that compel speech or regulate it based on its content are subject to strict scrutiny[.]" *Telescope Media Grp. v. Lucero*, No. 17-3352, 2019 WL 3979621, at *6 (8th Cir. Aug. 23, 2019) (citing *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015)). Thus, the Commission must prove that Section 2-33 is "narrowly tailored to serve compelling state interests." *Champion v. Commonwealth*, 520 S.W.3d 331, 335 (Ky. 2017) (quoting *Reed*, 135 S. Ct. at 2226). Ultimately, "[i]n an as-applied challenge like this one, the focus of the strict-scrutiny test is on the actual speech being regulated, rather than how the law might affect others who are not before the court." *Telescope Media*, 2019 WL 3979621, at *6 (citing *Phelps-Roper v. Ricketts*, 867 F.3d 883, 896 (8th Cir. 2017)).

Courts have long recognized the ability of government to protect individuals from discrimination in places of public accommodation following the enactment of the Civil Rights Act of 1964, which was subsequently upheld by *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964), and its progeny. While early cases were primarily concerned with racial

---

this case, with the objective that they may be of some assistance in the event these circumstances again arise, in a properly pled case, before the Lexington Fayette Urban County Human Rights Commission or a similar tribunal.

discrimination, governments, whether federal, state or local, have extended these protections to individuals based not only on race, but also on "familial status, race, color, religion, national origin, sex, age forty (40) and over, or because of the person's status as a qualified individual with a disability[.]" KRS 344.020(1)(b). As noted by the General Assembly, the public policy is to protect these individuals' "interest in personal dignity and freedom from humiliation, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest which would menace its democratic institutions, to preserve the public safety, health, and general welfare, and to further the interest, rights, and privileges of individuals within the state[.]" *Id.* The General Assembly has further expressed that nothing in KRS Chapter 344 "shall be construed as indicating an intent to exclude local laws on the same subject matter not inconsistent with this chapter." KRS 344.020(3).

Towards that end, in 1999, the Lexington-Fayette Urban County Government enacted what is popularly known as the Fairness Ordinance. Section 2-33 adds to the protected class individuals based on their "sexual orientation," or "gender identity."[10] As noted by the United States Supreme Court,

---

[10] At all relevant times, Section 2-33 provided:

(1) It is the policy of the Lexington Fayette Urban County Government to safeguard all individuals within Fayette County from discrimination in employment, public accommodation, and housing on the basis of sexual orientation or gender identity, as well as from discrimination on the basis of race, color, religion, national origin, sex, disability, and age forty and over.

13

Our society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth. For that reason the laws and the

---

(2) For purposes of this section, the provisions of KRS 344.010 (1), (5) through (13) and (16), 344.030 (2) through (5), 344.040, 344.045, 344.050, 344.060, 344.070, 344.080, 344.100, 344.110, 344.120, 344.130, 344.140, 344.145, 344.360(1) through (8), 344.365(1) through (4), 344.367, 344.370(1), (2) and (4), 344.375, 344.380, 344.400 and 344.680, as they existed on July 15, 1998, are adopted and shall apply to prohibit discrimination on the basis of sexual orientation or gender identity within Fayette County.

(3) The commission shall have jurisdiction to receive, investigate, conciliate, hold hearings and issue orders relating to complaints filed alleging discrimination in employment, public accommodation or housing based on the sexual orientation or gender identity of the complaining party. The commission is authorized to use the powers and procedures listed in sections 2-31 and 2-32 to carry out the purposes of this section, except that KRS 344.385, 344.635 and 344.670 shall not apply to the enforcement of this section.

(4) For purposes of this section, "sexual orientation" shall mean an individual's actual or imputed heterosexuality, homosexuality, or bisexuality.

(5) For purposes of this section, "gender identity" shall mean:
    a. Having a gender identity as a result of a sex change surgery; or
    b. Manifesting, for reasons other than dress, an identity not traditionally associated with one's biological maleness or femaleness.

(6) Nothing in this section shall be construed to prevent an employer from:
    a. Enforcing an employee dress policy which policy may include restricting employees from dress associated with the other gender; or
    b. Designating appropriate gender specific restroom or shower facilities.

(7) The provisions of this section shall not apply to a religious institution or to an organization operated for charitable or educational purposes, which is operated, supervised, or controlled by a religious corporation, association or society except that when such an institution or organization receives a majority of its annual funding from any federal, state, local or other government body or agency or any combination thereof, it shall not be entitled to this exemption.

14

Constitution can, and in some instances must, protect them in the exercise of their civil rights. The exercise of their freedom on terms equal to others must be given great weight and respect by the courts.

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018). The *Masterpiece* Court further recognized that notwithstanding a business owner's religious beliefs or philosophical scruples, "a general rule [is] that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Id.*

That said, and while government may validly proscribe conduct, *i.e.*, discrimination in public accommodations, the government may not regulate expression, either by prohibiting disfavored expression or compelling favored expression. *See Stromberg v. California*, 283 U.S. 359, 369–70 (1931) (overturning conviction based on display of a red flag as opposition to organized government); *see also Champion*, 520 S.W.3d at 335 (holding "any content-based laws—those that target particular speech based on its communicative content—are 'presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests[]'") (quoting *Reed*, 135 S. Ct. at 2226). The foregoing two cases illustrate a citizen's right to engage in disfavored expression.

As to compelled expression, Justice Robert Jackson, writing for the Court in *West Virginia State Bd. of Educ. v. Barnette*, famously stated "[i]f there is any

15

fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U.S. 624, 642 (1943). Since *Barnette*, the Supreme Court has held fast to its jurisprudence that government may not compel expression. *See generally Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018); *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000); *Hurley*, 515 U.S. 557; *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974). In *Janus*, the Court stated,

> The First Amendment, made applicable to the States by the Fourteenth Amendment, forbids abridgment of the freedom of speech. We have held time and again that freedom of speech "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); *see Riley v. National Federation of Blind of N. C., Inc.*, 487 U.S. 781, 796–797, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 559, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 256–257, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974); *accord, Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 9, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion). The right to eschew association for expressive purposes is likewise protected. *Roberts v. United States Jaycees*, 468 U.S. 609, 623, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) ("Freedom of association ... plainly presupposes a freedom not to associate"); *see Pacific Gas & Elec., supra*, at 12, 106 S.Ct. 903 ("[F]orced associations that burden protected speech are impermissible"). . . .
>
> Compelling individuals to mouth support for views they find objectionable violates that cardinal constitutional command, and in most contexts, any such effort would be universally condemned. Suppose, for example, that the State of Illinois required all residents to sign a document expressing support for a particular set of positions on controversial public issues—say, the platform of one of the major political parties. No one, we trust, would seriously argue that the First Amendment permits this.

Perhaps because such compulsion so plainly violates the Constitution, most of our free speech cases have involved restrictions on what can be said, rather than laws compelling speech. But measures compelling speech are at least as threatening.

Free speech serves many ends. It is essential to our democratic form of government, *see, e.g., Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), and it furthers the search for truth, *see, e.g., Thornhill v. Alabama*, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Whenever the Federal Government or a State prevents individuals from saying what they think on important matters or compels them to voice ideas with which they disagree, it undermines these ends.

When speech is compelled, however, additional damage is done. In that situation, individuals are coerced into betraying their convictions. Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding "involuntary affirmation" of objected-to beliefs would require "even more immediate and urgent grounds" than a law demanding silence. *Barnette, supra*, at 633, 63 S.Ct. 1178; *see also Riley, supra*, at 796–797, 108 S.Ct. 2667 (rejecting "deferential test" for compelled speech claims).

*Janus*, 138 S. Ct. at 2463–64. Significantly, "the choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control." *Dale*, 530 U.S. at 654 (quoting *Hurley*, 515 U.S. at 574–75). Simply put, "[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley*, 515 U.S. at 579. "The unmistakable message [from this line of cases] is that antidiscrimination laws can regulate conduct, but not expression." *Telescope Media Grp.*, 2019 WL 3979621, at *8.

17

The difference between permissible regulation of conduct and impermissible regulation of expression, or coerced expression, may be subtle, but, a difference exists.[11]

> The government could argue, for example, that painting is not speech because it involves the physical movements of a brush. Or it could claim that publishing a newspaper is conduct because it depends on the mechanical operation of a printing press. It could even declare that a parade is conduct because it involves walking. Yet there is no question that the government cannot compel an artist to paint, demand that the editors of a newspaper publish a response piece, or require the organizers of a parade to allow everyone to participate. *See, e.g., Tornillo*, 418 U.S. at 256–58, 94 S.Ct. 2831; *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., Inc.*, 515 U.S. 557, 572–73, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). **Speech is not conduct just because the government says it is.**

*Telescope Media Grp.*, 2019 WL 3979621, at *5 (emphasis added).

In the same vein, the Commission and its amici argue that regulating the printing of t-shirts merely regulates conduct, not speech. However, in "determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (citations omitted). From a shirt displaying a presidential campaign, to that carrying the name of a middle school soccer team, t-shirts carry messages and thus, their creation is not

---

[11] In *Masterpiece*, Justice Kennedy, writing for the majority, recognized the difficulty presented in balancing the interests of protected individuals in obtaining goods and services against a significant First Amendment claim. 138 S. Ct. at 1728.

simply conduct but is inherently expressive. *See Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1887–88 (2018) (noting types of expressive apparel as including t-shirts, buttons and armbands); *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 66 (2006) (First Amendment protection extends "only to conduct that is inherently expressive."); *Bery v. City of New York*, 97 F.3d 689, 695 (2nd Cir. 1996) ("[V]isual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection.").

In this case, what distinguishes whether the Commission is permissibly regulating conduct, i.e., prohibiting discrimination, or impermissibly crossing the line in an attempt to compel expression, a message? The record discloses three essential facts, which are conceded by the Commission: First, Hands On has an established practice of declining orders because of what Hands On perceives to be their morally-objectionable messages, no matter who requested them. In the two years preceding the hearing in this case, Hands On declined thirteen orders on the basis that it believed the designs to be offensive or inappropriate, including refusal to print shirts promoting adult entertainment establishments, pens promoting a sexually explicit video, and shirts containing a violence-related message. Second, Hands On accepted and completed an order from a lesbian singer who performed at the 2012 Pride Festival. Third, at no time did Hands On inquire or know the sexual orientation or gender identity of the persons with whom it dealt on behalf of GLSO. These facts indicate that

19

Hands On was in good faith objecting to the message it was being asked to disseminate. In case any doubt exists as to whether this case is about compelled expression, the Commission argued before this Court: "Hands On Originals' practice is censorship. They want you and this Court to affirm the fact that they can pick and choose who they want to serve **based on the message**." (emphasis added).

The Commission argues that the message expressed is in no way connected, nor can it be connected to Hands On. I disagree. As noted, numerous United States Supreme Court cases have expressly rejected this argument. In *Hurley*, at issue was the refusal of parade organizers to permit an LGBTQ+ group to march in the parade as a separate participating unit. The Court rejected the argument that the organizer was "merely 'a conduit' for the speech of participants in the parade 'rather than itself a speaker[,]'" stating that

> if the government were freely able to compel speakers to propound political messages with which they disagree, protection of a speaker's freedom would be empty, for the government could require speakers to affirm in one breath that which they deny in the next. Thus, when dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised.

515 U.S. at 575–76 (internal citations and quotations omitted).

In *Tornillo*, the Miami Herald challenged a Florida statute that mandated a "right of reply" by a political candidate to a newspaper's criticism. When the candidate sued to enforce access, which the newspaper denied, the newspaper

claimed the state was compelling expression. The Court stated, at length,

> We see the beginning with *Associated Press* [*v. United States*, 326 U.S. 1 (1945)], the Court has expressed sensitivity as to whether a restriction or requirement constituted the compulsion exerted by government on a newspaper to print that which it would not otherwise print. The clear implication has been that any such compulsion to publish that which "'reason' tells them should not be published" is unconstitutional. A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues it cannot be legislated.
>
> Appellee's argument that the Florida statute does not amount to a restriction of appellant's right to speak because "the statute in question here has not prevented the *Miami Herald* from saying anything it wished" begs the core question. Compelling editors or publishers to publish that which "'reason' tells them should not be published" is what is at issue in this case. The Florida statute operates as a command in the same sense as a statute or regulation forbidding appellant to publish specified matter. Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers. *Grosjean v. American Press Co.*, 297 U.S. 233, 244-45, . . . (1936). The Florida statute exacts a penalty on the basis of the content of a newspaper. The first phase of the penalty resulting from the compelled printing of a reply is exacted in terms of the cost in printing and composing time and materials and in taking up space that could be devoted to other material the newspaper may have preferred to print. It is correct, as appellee contends, that a newspaper is not subject to the finite technological limitations of time that confront a broadcaster but it is not correct to say that, as an economic reality, a newspaper can proceed to infinite expansion of its column space to accommodate the replies that a government agency determines or a statute commands the readers should have *available.*

*Tornillo*, 418 U.S. at 256–57. *See also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) (holding that a newspaper is a constitutionally protected speaker when its customer pays it to print an advertisement created by the customer); *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 925 (6th Cir. 2003) (stating

"[p]ublishers disseminating the work of others who create expressive materials also come wholly within the protective shield of the First Amendment.") (citing *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)).

*Tornillo* further demonstrates that compelled speech impacts a business such as Hands On since it exacts penalties in forcing it to print shirts it otherwise would have refused. One penalty results from "the cost in printing and composing time and materials and in taking up space that could be devoted to other material the [company] may have preferred to print." 418 U.S. at 256. Additionally, and perhaps more importantly, "[e]ven if a regulation that requires speech does not directly prevent speakers from saying anything they wish," another exacted penalty results from the company "conclud[ing] that the safe course was to avoid controversy." *Telescope Media Grp.*, 2019 WL 3979621, at *6 (citing *Tornillo*, 418 U.S. at 57 (internal quotations omitted)). As to Hands On, the "safe course" is difficult to discern. To go out of business altogether? To print everything requested no matter what? As noted by the Eighth Circuit, "this type of compelled self-censorship, a byproduct of regulating speech based on its content, unquestionably dampens the vigor and limits the variety of public debate." *Telescope Media Grp.*, 2019 WL 3979621, at *6.

The decisions in *Hurley* and *Tornillo* establish, and *Janus* reemphasized, "freedom of speech includes both the right to speak freely and the right to refrain from speaking at all." 138 S. Ct. at 2463 (citations omitted). The

22

prohibitions within the First Amendment limit government censorship. And, with respect to the circumstances in this case, or any of the infinite hypothetical scenarios proffered by the parties, the amici, or members of this Court, we, just like the Court in *Tornillo* (as to the desirability of a responsible press), may agree or disagree with the implications of that constitutionally protected right. But, when expression is involved, whether a parade organizer, a newspaper, or a t-shirt company, "a publisher may discriminate on the basis of content" even if that content relates to a protected classification. *World Peace Movement of Am. v. Newspaper Agency Corp., Inc.*, 879 P.2d 253, 258 (Utah 1994).

The circumstances of this case involving a legally recognized medium of expression are unique. As noted by Justice Kennedy, any number of public accommodations exist as to which a compelled expression claim would not be well-founded. *Masterpiece*, 138 S. Ct. at 1728 (stating "there are no doubt innumerable goods and services that no one could argue implicate the First Amendment[]").

Again, I fully concur with the majority opinion that no statutory standing existed in this case. But beyond that issue, if we were to reach the substantive issues, I would affirm the Fayette Circuit Court's Opinion and Order for the foregoing reasons.

23

COUNSEL FOR APPELLANT:

Edward E. Dove

COUNSEL FOR APPELLEE:

Bryan Howard Beauman
STURGILL, TURNER, BARKER & MOLONEY, PLLC

Kenneth J. Connelly
Jeana Hallock
James A. Campbell
Kristen K. Waggoner
ALLIANCE DEFENDING FREEDOM

COUNSEL FOR SUTHERLAND INSTITUTE AMICUS CURIAE:

Edward Leo Metzger III
ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC

COUNSEL FOR SHERIF GIRGIS AMICUS CURIAE:

Matthew C. Hess
BELL, HESS & VAN ZANT, PLC

COUNSEL FOR AMERICAN CENTER FOR LAW AND JUSTICE AMICUS
CURIAE:

Thomas Patrick Monaghan
AMERICAN CENTER FOR LAW & JUSTICE

Geoffrey R. Surtees
CENTER FOR LAW & JUSTICE FOR CATHOLICS UNITED FOR LIFE

COUNSEL FOR CENTER FOR RELIGIOUS EXPRESSION AMICUS CURIAE:

Stanton L. Cave
THE LAW OFFICE OF STAN CAVE

COUNSEL FOR CATHOLICVOTE.ORG AMICUS CURIAE:

Brian Keith Privett
BRIAN PRIVETT LAW OFFICES

Scott W. Gaylord
PROFESSOR OF LAW AT ELON UNIVERSITY SCHOOL OF LAW

24

COUNSEL FOR LAW AND ECONOMICS SCHOLARS AMICUS CURIAE:

Anthony Charles Donahue
DONAHUE LAW GROUP, P.S.C.

COUNSEL FOR ETHICS AND RELIGIOUS LIBERTY COMMISSION AMICUS CURIAE:

Aaron John Silletto
GOLDBERG SIMPSON, LLC

John J. Bursch
BURSCH LAW PLLC

COUNSEL FOR JEWS AND RELIGIOUS LIBERTY AMICUS CURIAE:

Aaron John Silletto
GOLDBERG SIMPSON, LLC

John J. Bursch
BURSCH LAW PLLC

COUNSEL FOR KENTUCKY BAPTIST CONVENTION AMICUS CURIAE:

Aaron John Silletto
GOLDBERG SIMPSON, LLC

John J. Bursch
BURSCH LAW PLLC

COUNSEL FOR CATO INSTITUTE AMICUS CURIAE:

Christopher L. Thacker
BILLINGS LAW FIRM, PLLC

Eugene Volokh
SCOTT & CYAN BANISTER
UCLA SCHOOL OF LAW

COUNSEL FOR THE BECKET FUND FOR RELIGIOUS LIBERTY AMICUS CURIAE:

Richard Garrett Griffith
Elizabeth S. Muyskens
STOLL, KEENON & OGDEN, PLLC
COUNSEL FOR TYNDALE HOUSE PUBLISHERS, INC. AMICUS CURIAE:

25

COUNSEL FOR TYNDALE HOUSE PUBLISHERS, INC. AMICUS CURIAE:

Wesley Reed Butler
Holly Iaccarino
BARNETT BENVENUTI & BUTLER PLLC

COUNSEL FOR COMMONWEALTH OF KENTUCKY, EX REL. MATTHEW G. BEVIN, GOVERNOR AMICUS CURIAE:

Mark Stephen Pitt
Stephen Chad Meredith
Matthew Kuhn
OFFICE OF THE GOVERNOR

COUNSEL FOR THE STATE OF ARKANSAS, ALABAMA, KANSAS, LOUISIANA, MISSOURI, NEBRASKA, OKLAHOMA, SOUTH CAROLINA, TEXAS, AND WEST VIRGINIA AMICUS CURIAE:

John Choate Roach
RANSDELL, ROACH & ROYCE PLLC

Dylan L. Jacobs
ASSISTANT SOLICITOR GENERAL OF ARKANSAS

COUNSEL FOR LEGAL SCHOLARS AMICUS CURIAE:

Brian Lee Schuette
Joshua Hershberger
CRAIN SCHUETTE ATTORNEYS

COUNSEL FOR AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE AMICUS CURIAE:

David B. Tachau
TACHAU MEEK PLC

Robert D. Kamenshine
Richard B. Katskee
Kelly M. Percival

COUNSEL FOR ANTI-DEFAMATION LEAGUE AMICUS CURIAE:

David B. Tachau
TACHAU MEEK PLC

26

Robert D. Kamenshine
Richard B. Katskee
Kelly M. Percival

COUNSEL FOR BEND THE ARC AMICUS CURIAE:

David B. Tachau
TACHAU MEEK PLC

Robert D. Kamenshine
Richard B. Katskee
Kelly M. Percival

COUNSEL FOR A JEWISH PARTNERSHIP FOR JUSTICE AMICUS CURIAE:

David B. Tachau
TACHAU MEEK PLC

Robert D. Kamenshine
Richard B. Katskee
Kelly M. Percival

COUNSEL FOR CENTRAL CONFERENCE OF AMERICAN RABBIS AMICUS CURIAE:

David B. Tachau
TACHAU MEEK PLC

Robert D. Kamenshine
Richard B. Katskee
Kelly M. Percival

COUNSEL FOR INTERFAITH ALLIANCE FOUNDATION AMICUS CURIAE:

David B. Tachau
TACHAU MEEK PLC

Robert D. Kamenshine
Richard B. Katskee
Kelly M. Percival

COUSEL FOR LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC. AMICUS CURIAE:

David B. Tachau
TACHAU MEEK PLC

Robert D. Kamenshine
Richard B. Katskee
Kelly M. Percival

COUNSEL FOR PEOPLE FOR THE AMERICAN WAY FOUNDATION AMICUS CURIAE:

David B. Tachau
TACHAU MEEK PLC

Robert D. Kamenshine
Richard B. Katskee
Kelly M. Percival

COUNSEL FOR UNION FOR REFORM JUDAISM AMICUS CURIAE:

David B. Tachau
TACHAU MEEK PLC

Robert D. Kamenshine
Richard B. Katskee
Kelly M. Percival

COUNSEL FOR WOMEN OF REFORM JUDAISM AMICUS CURIAE:

David B. Tachau
TACHAU MEEK PLC

Robert D. Kamenshine
Richard B. Katskee
Kelly M. Percival

COUNSEL FOR NATIONAL COUNCIL OF JEWISH WOMEN, INC. AMICUS CURIAE:

David B. Tachau
TACHAU MEEK PLC

Robert D. Kamenshine
Richard B. Katskee
Kelly M. Percival